Good morning. My name is Barry Willoughby. I represent the individual defendants in this appeal. I'd like to reserve three minutes in rebuttal, if I may. I have a little bit of a cold, I think, going. So if I don't keep my voice up, please tell me I'm trying to struggle through that. Do you have water there? My colleague's giving me water in case I need it. The issue today in this appeal is a review of a denial of qualified immunity by the district court in connection with a First Amendment claim of retaliation by the plaintiff, Tom Lipinski. As the court's well aware, the collateral order doctrine allows appellate review of a denial of qualified immunity in certain contexts, and we believe this is one of them, because of the importance of the doctrine of qualified immunity. Obviously, the courts have said many times over the years. But why would the record here allow us to have jurisdiction under Cohen? Your Honor, my understanding of the case law is under Barron's and Johnson and Riley in this court, is that on review, the facts identified by the district court are the facts the court looks at. What facts did the district court identify? There was several bullet points where the court identified ten items of alleged public statements by the plaintiff that the court found were to be. Public statements, but what facts did the court identify to help us get a handle on whether or not the judge found. Your Honor, I do agree that the court had a very extensive factual record in front of it, and unfortunately, the opinion did not spin out those facts in any great detail. It's kind of like a sonnet. It is really, you know. I understand. And under Forbes, we have asked district judges to let us know the facts that are disputed, the facts that aren't disputed on summary judgments so that we can make a ruling. And I know this case has been kicking around for a long time, but speaking only for myself, I've got two of my colleagues who may well disagree, but I don't know how we can get a handle on this without yet another remand. Your Honor, and there's no doubt that under the court's supervisory power, the court has that authority. I mean, there are cases certainly, I think, Rouse, I believe, is one where the court, you know, remains for specific factual development of the record by the district judge. So certainly, there's no question the court has that authority. I guess from our standpoint, the case has been around for a long time. Mr. Lukensky has been given a fully, you know, fair opportunity to develop the record, and the record is pretty extensive in the court. I think looking at what – Well, but it cuts both ways. I understand. You should have been given an opportunity to develop the record too. And that's fair enough, Your Honor. I understand that. But when you look at the identified speech, in our view at least, all of the speech is employee speech under Garcetti. So there's a very clear – Well, most of it clearly is. I mean, I think we've got nine or ten categories here. Yes, Your Honor. Again, speaking only for myself, I mean, custodian funding, VOTEC funding, salary complaints, athletic gate receipts, the ongoing dispute about the choicing in and choicing out housing patterns, that stuff seems to be right smack in the heartland of his duties. In fact, there were some admissions where Mr. Lipinski candidly admitted as much. But how do you argue that the school board travel scandal and the kitchen misuse, I mean, this gentleman wasn't in charge of the elementary school. He got informed by a parent about some unethical, perhaps even illegal, conduct at an elementary school. That has nothing to do with his job. I think it does, Your Honor, respectfully. When you look at the development of the Garcetti opinion, I think what's happened is that Garcetti has shifted the analysis to the role of the speaker rather than the content. And in this case, dealing with the – I call it the chicken at Burnett, the food at the elementary school, which was closed, by the way. In that case, a parent of Mount Pleasant High School came to Mr. Lipinski as principal of the high school. Mr. Lipinski's response to that was to call Kim Dougherty, who was the head of food service, and report it. So just like Foraker, he's reporting. He knew it, right. That gives him an opportunity to perhaps wield some influence, but that had nothing to do with his duties as a high school principal. It would be as if the prosecutor in Garcetti called somebody in an entirely different office. I mean, I just don't see that. Well, Your Honor, he's a high-level management official of the school district. I think that anybody who is at that level who has some impropriety being reported to them has an obligation to report that through the chain of command. Or he could have said, I have enough trouble dealing with this high school and go talk to the elementary school people. He didn't have to respond to that. He had no obligation consistent with his duties as principal of the school. And also, with regard to the school board travel scandal, which someone was prosecuted for, that wasn't part of his duties. Again, let me go back to the kitchen thing, and then I'll address the travel. I would argue that as a high-level management official, administrator of the school district, if a parent comes in to you and says to you, I believe there's some propriety going on at some other location in the district, that you have that obligation to go to a closed facility, yes, to go through the chain of command, which is what he did. Why is that? It's another school you said is closed. Why? You're basically saying that once you become a principal, you're responsible for anything that comes to your attention and that you relate that's all within the scope of your employment because of your level of employment. Anything, your school or not, you're responsible for it. So if you find out that some – taking that to its logical conclusion, if he finds out something's amiss in another school district, which is somehow going to impact on one of the people on the school board, he has an obligation as one of the high-level people in his district under that school board to report that to the chain of command. There's no end to it, is there? Well, Your Honor, I think in this case, when I look at Garcetti, I look at 4 Acre, I look at Gorham versus Sessons, I think the connection that is common is that the specialized knowledge, as I said, in 4 Acre, is key to deciding whether or not the speaker was speaking as a management employee, as an employee, or as a citizen.  Yeah, but isn't that specialized knowledge? 4 Acre is a bullet shop. I never heard the term before. And the person had to operate in a safe environment. Chickens are different. Respectfully, Your Honor, that's not what 4 Acre says. They were very clear that the specialized knowledge was not the technical expertise of the firing range and the lead in the bullets raising the blood level. What they said was it was being exposed to that information in the workplace. It gave them special knowledge that a citizen outside of the firing range would not have about those circumstances. What if he had been at the local bowling alley and the same person comes up to him and tells him about the folks who are carrying on a catering business in the refrigerators? Would that make a difference? Again, Your Honor, I believe that if he was being approached because he was principal, a high-level administrator in the district, and that was the reason the person approached him, expecting him to do something about it, and he did do something about it, I think that is the workplace connection. I mean, now, he's at the bowling alley. It just seems like you're treating him like the superintendent. I mean, you're right. If he's the superintendent or a school board member that has control or auspices over the entire district, that would make more sense. I mean, the principal is in charge of that particular school, is he not? He's in charge of that school, but he is one of only three principals in the district. He's an extremely high-level management employee. According to his own testimony, he was the persona of the school. But he's in charge of that school, not the whole school district. Right, and the principals met together, it's in the record, talked about all of these issues. Well, because there were principals of other schools who were there, but he's in charge of his fiefdom is his school. I agree that, Your Honor. But when I look at Foraker and the other cases, to me, what Garcetti is saying, if the knowledge of the incident that's being reported arose out of the fact that the person was an employee as opposed to being a citizen, that is the connection. I mean, Garcetti was very – You're saying just because he is employed in a management position within an organization, this public entity or not, you want us to broaden the holdings of any case and say any employee cannot complain about anything outside of his little fiefdom, but within the larger umbrella or under the larger umbrella of that particular agency. Your Honor, I'm not asking for that broad of a ruling. This is a high-level management official. I don't know where you are not asking for that if you're talking about the board member conference reimbursement. Well, I haven't addressed that. Let me address that. The facts of that are very, very specific and very, very limited. Mr. Lipinski went to a conference in – I think it was in San Diego. A private citizen, not a board member, not an auditor, not anybody else, asked him about whether or not a board member had been there, and he said he had not been there. That's all he did. There was no contact with the board. There's no evidence in the record the board even knew about that. There's no evidence of the state auditor who looked into it, even though Mr. Lipinski was in any way involved. That's the sum and substance of the entire so-called scandal. So that one I'm saying is he was certainly acting as a principal and providing the information, but I don't think there's even speech at all there. I mean, I think all he did was tell someone in response to their request that this individual had not been at the conference. But he certainly was not going to the board. He was not whistleblowing. He wasn't contacted by the state auditor. But it's not beyond the pale to imagine that providing that information could have set in motion a chain of events that got somebody even above Mr. Lipinski very upset with him and caused the retaliation of which he complains. So how can you say that's not speech? He said something that got someone else not only in trouble but got them prosecuted criminally, and then he suffers an adverse job action, and he's trying to link the two together. Now, who knows whether they're linked or not. How do you say it's not protected speech? Well, it seems to me he was doing it in his role as principal. Again, he was responding to a person's request about this information, and that certainly was a conference he was at. Again, he was an employee of the district at the conference, and he gave that information. Certainly, I agree with you, Your Honor, at this context, the other factual issues about who even knew about that are not up for review. So I understand that. What would ever be the motivation for any such management official in a school district, a principal in this case, to ever report wrongdoing within the school district if they could not have their job protected after they made such a report, even if it is a second- or third-hand report? I understand, Your Honor. I think that Garcetti was very clear that the purpose of Garcetti. I can't tell you how many times I've heard Garcetti. You're seeing something I'm not seeing. Well, what I meant by that is that what Garcetti was saying is that we're not about constitutionalizing employee grievances, that there are a number of other kinds of remedies. There's whistleblower statutes. There's merit systems. There's many other kinds of remedies out there for employees. And what the Court, at least in my view, was about was not making this issue a constitutional tort, so to speak. That's part of my problem with Garcetti. They may well have said that, but that's conic. We're not talking about an employee grievance here. We're talking about, in some cases, things that didn't even pertain to him or her. Somebody else, the school boy traveling to a conference, the chickens, wasn't his school, wasn't his refrigerator. That didn't pertain to him. I was trying to respond to the question about why, what would be the incentive to report, and I wasn't dealing with those other issues. But to me, the incentive is first of all. What is the incentive? I think that if you're a competent management employee, you have an obligation and an ethical duty and a contractual duty to report that kind of wrongdoing to your employer. And there are other protections. I mean, that's the point of Garcetti. There's whistleblower laws. There's merit system statutes. There's any number of collective bargaining agreements, although in this case he's a principal, so that wouldn't apply. But there are any number of other remedies out there. And to me, at least, the point of Garcetti was that we can't constitutionalize everything and that this employee issue. Except, you know, a few hundred years ago I think the founders thought they were constitutionalizing the right to free expression vis-a-vis actions of the state. So you cannot say. In terms of the employee grievances. You cannot constitutionalize everything. We can't get you out of the bag. I'm sorry. No, go ahead. I was referring to the employee grievance issues in this case. So to me, at least, when I look at Garcetti, look at the follow-up cases, what the court is saying is, look, there's other remedies out there. When the person is speaking with knowledge they gained in the workplace, particularly a high-level management official like this, that's not going to be a constitutional tort. There may be other kinds of remedies out there, but we don't want the courts dealing with all these so-called First Amendment kinds of claims. I think that's the purpose of Garcetti. I'm out of time. I don't know if I have any opportunity to address the clearly established issue. Did you save time for about all I said? I saved three minutes, Your Honor. Okay. We'll hear from you again then.  Thank you very much. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Neil Lipinski from the law firm of Elliott Greenleaf. You're the plaintiff's son? I am, Your Honor. No pressure. Not at all. He's in the courtroom as well. So unlike the last time we were here. You heard our last case, we talked about a shotgun, an assault-on shotgun. Well, you're talking about a shotgun approach to pleading. Well, Your Honor, and we You got these closures on a witness list as a protected statement? That's right, Your Honor. And it's hard to encapsulate something like seven or eight years of continued, what we think is protected speech. That predated Garcetti by a decade. How did he get his hands on a witness list? It almost looks like just kind of a tongue-in-cheek, wink-and-nod, filling out of the complaint and just kind of throwing in anything you can possibly reach out to and imagine that that constitutes speech. I don't want to get bogged down in that particular issue, but the theory was that that's a clear communication to his superiors, that he had spoken with those. You're saying it's not the inclusion on the witness list, but the superior side information that he had spoken to someone because of his inclusion on the witness list. That reasonable inference. That's right. Maybe I could help you a little bit on this. What's interesting to me is you didn't plead it in the shotgun fashion of seeing other cases pleaded where you didn't make a ten-count complaint listing each of these. You have one count for retaliation. And then within that count, you have a variety of factual averments. Yes, sir. But under Garcetti, aren't we obliged? I wish the district court had done this. But now that we have the case, isn't it prudent for us to explain to the district court which of these nine or ten categories under Garcetti is protected speech and which not? And I pose the inverse question to you that I pose to opposing counsel. I can't find anything here to be protected other than the school board travel scandal and the kitchen misuse. That doesn't mean you might not get into evidence the history, but when we are going to, if we send this back down, I don't know if we are or not, but if we do, should we not tell the district court exactly which categories are protected under Garcetti and which are not? I think there are two answers to that question. The first is in Walter versus Pike County case, this court laid out essentially what it was able to do in reconstructing a weak district court factual record, which clearly is what the court has handed today. And the court wrote, if there are minor gaps in the district court's factual recitation, we can determine what facts the district court in light most favorable to the non-moving party likely assumed. So the court feels that the court is able to do that on the existing record. But this has more than, you answered this with your last phrase, this really has more than minor gaps. And the whole kettle of fish here boils down to whether or not Mr. Garcetti, if at the time he made the statements, he's speaking as an employee, you know, that's it. And it looks from the district court's explanation of what he did in laying out the test, he laid out the black letter tests, but intermingled them in such a way that at least I found myself a bit lost in terms of the Pickering analysis and those things. You don't get to Pickering if he's speaking as an employee, that's it. And so I'm not totally sure what he happened here. He's laying out the test at page three of the printout. Anyhow, he talks about Garcetti and then Connick and then Pickering, and then the statements that are alleged. And I'm not sure the factual record is sufficient for us to determine with some of them. And this is sort of my second answer to Judge Hardiman's question, and that is if qualified immunity denials on summary judgment only become collateral orders when we argue the sufficiency of that set of facts when viewed most properly. And vis-a-vis any given statement, not all of them, but vis-a-vis the statement. Yes, sir. And ostensibly that's the appellate argument that has been laid out by the defendants. But in reality what they've done is attempted to recast the record from the summary judgment record and throw at the court disputed facts, facts that really talk to pretextual reasons and that sort of thing, discounting and diminishing the import of the speech Lipinski made. I don't think that any of that should be considered by the court. If the court is going to do anything, it really has to look at either the bit of finding of facts, which are simply a restatement of the allegations and retaliations in the court's opinion. And then see if it can't plug in those holes with the facts that the plaintiff is asserting that are really in favor of its case. Looking at the court's opinion, he talks about the qualified immunity issue. He said, I turn next to the issue, next to test whether the right is clearly established. As a general matter, the right is clearly established when the contrary is sufficiently clear. And then he finds, well, the right to expression is freely established under the First Amendment, end of inquiry. But that's clearly not the inquiry that is sufficient for us to determine whether or not he's right on the qualified immunity now. Because you have to look at every expression, as I said, and determine in the context in which that expression was made, a reasonably analogous context, the right was clearly established. And that's a whole different ballgame. And I just, at least I, speaking for myself, have real trouble saying that the district court got it right, given the analytical approach, the legal approach that he took. And I don't think the statement of facts as set forth by the court allows this legal analysis of at least the end questions. And what I would hate to see is a direction from this court on remand to flesh out those facts only as to the two incidents that don't relate in any way to Mount Pleasant High School. I'd rather have an entire statement of facts. Well, I understand that. That's probably a good point. Because you're saying that these two things that we focused on, the school boy scandal and the dead chickens in the kitchen, but the catering issue, the kitchen misuse, might obviously suggest themselves as being beyond the scope of employment. But there may be some other things that on the face look like it's employee speech and may, in fact, not be once the record is developed. That's what you're arguing. That's right, Your Honor. And I think it's important to go back to Judge Hardiman's observations about some of those other particular areas of speech, some of which appear at face value, perhaps, to this court as entirely related to a principal's job duties. Well, some of them he said, he admitted. The deposition of Fort Garcetti, some of them he said at the deposition, yes, I did that as part of my job. It depends on how we review the record. And that's the problem that the Court has presented with. But if we look at the record in a light most favorable to the plaintiff, and you look at JA 724, here's the rest of the plaintiff's deposition transcript. And what's key here is that in most, if not all, of these allegations, Lipinski is talking about misconduct or misappropriation that's made at a high or higher level by decision makers above his authority, outside of his authority, and other schools, like the Athletic Gate Receipt. It's Concord High School and another high school. That's Garcetti, though. Garcetti was complaining about misfeasance by superiors, right? I mean, it – They weren't necessarily superiors. The difficulty I think you have is that Garcetti is just a challenging decision because if your client's boss did something egregious and outrageous and reprehensible, and like a good citizen and a good administrator, your client discloses that. But it dealt precisely with his work. Let's say it dealt with his budget. Let's say his school gets a million dollars a year, and he finds out that his boss is stealing $100,000 a year. Garcetti says that that's not protected speech because it's to do with his employment. Now, based on what you've heard, you may deduce that Garcetti also, at least in this judge's view, says that if he calls out the superintendent for stealing $100,000 from a different school in the district, perhaps a competing high school, that is protected speech. So we're sort of in a strange land here in the short time that we have to interpret Garcetti the last few years. You're right, Your Honor, and we agree in large part with what you said, but I think the key distinction here is to go back to the record, one that's not laid out for the Court, and look at those communications. For example, it seems to me the Court is saying with regard to vocational technology funds, your complaint, Lipinski, is that you were supposed to get X, and you got X minus 10, and that hurts. And in part, that is his complaint. But if you read the actual letter, he says, and I'm sure this is happening at other district schools and needs to be corrected. If you read the auditor's report that results from that, it's a district-wide evaluation of 509 funds, and the results are we gave you $1.2 million. You only gave $300 and change to these schools. What about the gate receipts? And they're in the deposition. We can at least try to narrow this down. In the gate receipts, he was specifically asked whether or not that was part of reading, and that was part of your responsibility as principal to follow up on that, correct, talking about the way the gate receipts are not properly paid out. And he says, I would assume, yes, yes, it's my responsibility. And he also says later on in his testimony, again, this is in that JA 724, I think through 726 area, and I'm paraphrasing now, that it's not my job as principal of school A to tell my bosses that people from schools B and C are stealing. And that's the same speech because it's not that Mount Pleasant is not depositing its gate receipts. It's that these other two schools, he finds out, are not. And that sounds like theft. And that's confirmed in the auditor's report. The auditors don't find that. When you read the cross-examination of Draper, the chief auditor, they did nothing to find that. They accepted ridiculous evidence in support of the notion that this money was actually just put in a different account and was all accounted for. Let me ask this, and this will put a real monkey wrench into things. I'm not really sure what the answer is. Is that inquiry, whether or not it's employee speech or citizen speech, is that a question of law or a question of fact from your perspective? Well, it's a mixed question, and that is the problem. As we sit here having this back and forth about what the content of that speech is, it's up to a jury to decide, did Lipinski actually say other people at other schools are stealing? And once that's determined, then the court steps in and says, well, as a matter of law, that's citizen speech. Oh, no, it was just Mount Pleasant. As a matter of law, that is employee speech. We're not really there yet. So you're saying even as to what I read on the deposition, that's not appropriate for resolution because there are other things in there where to put that in context, and it's not clear. Even though he said it was his responsibility, arguably, as a matter of fact, it goes beyond his duty. In part, not. And that's the problem with the jurisdictional threshold question. You can paint the appeal as one that says the sufficiency of the record is inadequate. It is insufficient to support a constitutional violation of a clearly established right. But then when it's argued, it's just look at these through the defendant's looking glass. Just look at the facts as we are spinning them, and it's clearly employee speech. In fact, the entire statement of facts, as I was pointing out before in the defendant's opening brief, is that third element under Swineford, that sort of thing where the burden shifts back to the defendant and they can tell you why his firing had nothing to do with all of this speech. Well, why would they lead in with that? Because they're trying to recast the record in the favor of the defendants. And I appreciate the position the Court's in. What do you recast the record on this? Housing patterns for school district, MPHS, truancy rates, directly related to your client's position. Well, that's another pricklier issue under Garcetti. There's no doubt that that's the case. But in context, those communications, that speech, came to him from citizens within the Mount Pleasant School District. And he didn't speak up in some formal line of communication. He went to a school board meeting. Wait a minute. It's not where he got the information. It's what he did with it. That's why he was reprimanded, according to you. It's not that he just was a parrot and repeated anything anybody ever told him. This is right in his bailiwick. And if it affects his school, he needs to do something about it. So how could it not be part of his employment duties and responsibilities? I guess the issue there is, with respect, to some extent, it does matter where he gets the information from. And that's the Forecker case. Where do you get this highly technical information as it arrives during your job duties? Well, is it arguable that the citizens in the committee would approach the principal and say we want this presented to the school board, we think you're a good voice for it, and that that would not be within his official job duties or rising out of his role as principal? I think that's colorable. And the idea that he's retaliated because he gives the bad facts about the district in a public school board meeting? I'm not sure any of this slicing the onion matters. If you get to the jury on count one, retaliation, I'm struggling with what in the world the jury instructions are going to look like. I mean, is the jury going to be charged? Do you find that when Lipinski complained about the VOTEC allocation,  That's the legal question. I tried to envision the interrogatories because there's case law that says that this is properly set forth in an interrogatory to the jury, therefore it's a question of fact, therefore it's not right from the collateral reduction, all of that. You say that very well. Thank you. I've been reading it for 10 years. You'll be in the appeal one day, Mr. Lipinski. So I, of course, I endeavored four years ago to try to craft some interrogatories. And it became clear to me that that was the legal question that Your Honor is asking. If there could be an interrogatory cast, it would be, do you find that Lipinski complained about or spoke about this issue as it relates to Mount Pleasant exclusively? Or did he also speak about the issue that related to other schools or district-wide misappropriations or issues, et cetera? Something in that category to me. Whereas the district can then, excuse me, the jury can then foreclose the legal question by saying, yes, it's only related to Mount Pleasant. I mean, something like that. And that record is what the plaintiff largely put forth in its briefing. The other record, which you expect to hear from trial, is what you see in the defendant's brief. Things like, if the complaints about 509 funds were entirely inaccurate, that doesn't belong in front of this court. That's not viewing the record in the light and most favorable to the plaintiff, appreciating that there's not much of a record in the order to work with, but a straight remand to say, we find, based on the way these facts are spun here before this court, that these issues are clearly Gar-City and these two are not, is a little bit dangerous. But maybe the best thing would be a Forbes remand where we send it back and ask the court to let us know what facts he was relying upon in terms of qualified immunity summary judgment. The case is 10 years old, and in that time we have lost at least four witnesses that died. One of them was the special evaluator who actually conducted that 1997 evaluation. It's very difficult for me to sit before this court and say that is the better course of action, but that is the intellectually, I think, honest response. I know this person is clearly not a Philadelphia lawyer. What is it in the Middle District and in Arlington? There's a candor and a collegiality that we don't, at least I don't, these folks might say more than I do. I'm not used to saying it often, but that was a very wonderful answer. Mr. Lewin, can I thank you for it? Thank you, Your Honor. My time is up. There's nothing further. Thank you. Mr. Willoughby. Thank you. We do in the Delaware Bar believe, pride ourselves on being very collegial. You have that reputation. It's true. More than any bar I know, you have that reputation. It's really true, and it's emphasized to us as young lawyers and as senior lawyers. Your Honor, I didn't get a chance to address the surely established issue in qualified immunity. We were talking about Garcetti as the first step in deciding whether or not there should be qualified immunity because the first step is deciding whether or not there has been a constitutional violation, and obviously that's an issue I think we've talked about a good bit. One just side point real quick is when you review the district judge's opinion, unfortunately he appears to confuse Garcetti and Connick because he appears to say if it's a matter of public concern, therefore it's citizen speech. So I think that's an issue to be put aside. And the picking balance comes in on top of that where it doesn't belong. Right. Yes, Your Honor. Your theory is under Garcetti we don't even get to Connick or Pickering if it's employee speech. Yes, Your Honor. And the second sort of backup position I didn't get to argue was that the courts identified at least two things that concerned the chicken, so to speak, at Burnett and the school board issue with the expenses. That is an issue where I think qualified immunity should be awarded to the individual defendants. Again, when you look at the standard, certainly it's not clearly established that that kind of speech would be protected activity. So the school board is sitting there in December of 1999 trying to review whether or not Mr. Lipinski should be non-renewed or not. And the parameters for deciding what is and is not protected activity has hardly, you know, before then have been developed. But Connick was decided in 83. I don't understand that argument. Because this stuff happened before Garcetti, and it's a much more pro plaintiff standard before Garcetti. I think that's a legitimate point, Your Honor. But what I'm saying is that the analysis of what is and is not protected activity remains fuzzy. I mean, I think even we said in our earlier discussion, we talked about that, and there's a district court opinion by Judge Sleet, and our district talks about there will be thousands of billable hours trying to figure out Garcetti. So what I'm saying is if you're at the school board back in December of 1999 trying to find, decide what is and is not protected speech, that's an awful fine analysis to ask a school board member to make. And on top of that, we have the whole Pickering balancing issue that has to go into it. So from a qualified immunity standpoint, independent of the question of whether there has been a constitutional violation, I think the individual should be getting qualified immunity at a minimal. You could almost make that statement. You're arguing Connick and Pickering know Garcetti in terms of clearly established. You could almost make that statement as to any public employer in public employee speech, because the Pickering balance is so amorphous, the balancing act. You could ask, well, how would you know the balancing act is going to come out that way? I mean, that would really be the adoption that would seem to me to kick the entire ball out the window. Your Honor, first of all, the qualified immunity doctrine is very clear. The qualified immunity is the norm. I mean, that's what we're talking about from the Supreme Court. And there are cases cited in our brief that say what Your Honor is saying. I'm not saying it's a hard and fast rule that every time you've got Pickering balancing, there must be qualified immunity. But we cited two cases, one a district court of Delaware case, Hague versus Brady-Wine School District, where Judge McKelvey decided that. The other case, I believe, it's a circuit court case. I believe it's an 11th Circuit case, but it's in our brief, where the court points to the fact that when you have Pickering balancing involved for board members or public officials, the presumption is going to be that there's qualified immunity because you're asking for very, very fine and sensitive judgments. And one last point on that that I think is important is when you look at qualified immunity, the subjective motivation, subjective purpose of the individuals making the decision is not irrelevant. It's an objective reasonableness standard. This court in Blalock versus the City of Wilmington specifically found that, and there are many other cases saying that. Judge Stapleton's opinion in that case, it was an arrest case. And what he said specifically was, based on Harlow and other cases, is that if the arresting officer could have believed he had probable cause based on the facts, regardless of his subjective motivation, for qualified immunity purposes, he gets it. So what I'm saying – Harlow also talks about, and we had this in another case earlier this week, Harlow also has that phrase in there, talking about extraordinary circumstances, absent extraordinary circumstances, which makes no sense. But I would at least agree that it's an objective test, not a subjective one. Okay. Thank you. Thank you. Could we just seek counsel for – do you have another question? Okay. Could we just seek counsel for –